FRANKLIN COUNTY WELFARE RIGHTS ORGANIZATION,
APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO,
APPELLEE.
COLUMBIA GAS OF OHIO, INC., APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Franklin Co. Welfare Rights Org. v. Pub. Util.
Comm. (1978), 55 Ohio St. 2d 1.]

(Nos. 77-1083 and 77-1195—Decided July 5, 1978.)

*Mr. Bruce E. Friedman*, for appellant Franklin County Welfare Rights Organization.

*Mr. James L. Fullin* and *Mr. Roger C. Post*, for appellant Columbia Gas of Ohio, Inc.

*Mr. William J. Brown*, attorney general, *Mr. Marvin I. Resnick* and *Mr. Mark C. Sholander*, for appellee Public Utilities Commission.

4

*Mr. Gregory S. Lashutka*, city attorney, *Mr. Patrick M. McGrath* and *Mr. John W. Bentine*, for intervening appellee city of Columbus.

## I.

CELEBREZZE, J. In case No. 77-1083, appellant, F.C.W.R.O., presents several propositions of law, the first of which is an assertion that the commission "* * * acted unlawfully and unreasonably in ignoring the language and intent of R . C. 4909.152 concerning the adequacy of service * * *."

R. C. 4909.152 states, in pertinent part, as follows:

"In fixing the just, reasonable, and compensatory rates * * * to be * * * charged for service by any public utility, the * * * commission may consider the efficiency, sufficiency, and adequacy of the facilities provided and the services rendered by the public utility, the value of such service to the public, and the ability of the public utility to improve such service and facility.

"If the commission determines that the facility or service is inefficient, insufficient, or inadequate, the commission may order the public utility to improve such facility or service to a level determined by the commission to be efficient, sufficient, or adequate. However, in any order entered pursuant to section 4909.19 of the Revised Code, the commission shall authorize a rate of return that is just and reasonable."

In its August 24, 1977, entry the commission stated the following with respect to R. C. 4909.152:

"As all recognize, last winter was the coldest in the history of the company, and extensive hardships were experienced due to the forced closings of businesses and schools. Despite these conditions, service was maintained without interruption to the residential customer. * * * The Commission cannot conclude that the service was inadequate within the meaning of that term as employed in the statute, nor is there a basis in this record for adjusting the rates previously authorized."

It is appellant's position in effect that the hardships of

the winter of 1976-77 are a matter of record, that Columbia's service was *per se* inefficient, insufficient and inadequate, and that therefore the commission must lower the rates which were previously authorized.

It must be recalled that this court will not disturb a finding by the commission unless it is manifestly against the weight of the evidence, and so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. *Ford Motor Co.* v. *Pub. Util. Comm.* (1977), 52 Ohio St. 2d 142, 152. Given the evidence in the record that the winter of 1976-77 was unusually severe, and that Columbia was nevertheless able to maintain continuous service to its residential customers under such extreme conditions, this court will not substitute its judgment for the commission's determination that, under the circumstances, Columbia's service was not inefficient, insufficient or inadequate.[3]

In its second proposition of law, F.C.W.R.O. asserts that the commission acted unreasonably and unlawfully in changing the test year period from March 1, 1976, through February 28, 1977, as originally proposed, to January 1, 1976, through December 31, 1976. Although conceding that R. C. 4909.15(C) grants the commission the discretion to vary the otherwise statutorily-indicated test year, F.C.W.R.O. contends in essence that eliminating the frigid months of January and February, 1977, from the test period had the ultimate effect of causing Columbia's revenue deficiency for the test year to be unrealistic. Because large volumes of gas were sold during the first two months of 1977, appellant argues that the commission abused its discretion when it changed the test year period, pointing out that such action resulted in utility rates that were higher under the substituted test year than they would have been had the original test year been implemented.

The above argument indicates a fundamental mis-

---

[3] Because of our determination on the preliminary question of adequacy of service we need not discuss appellant's claim that should the commission find that a utility's service is inadequate it may, pursuant to R. C. 4909.152, fix lower future rates.

understanding of the basic reason for the use of test year results in utility rate regulation. The test year operations of a utility are utilized to determine whether that utility should be authorized to earn additional operating income from proposed future rates. The test year results must therefore be reasonably representative of normal operations. Appellant has not shown that the calendar year 1976 was less representative, for the purposes of this cause, than the originally proposed test period, which would have included two abnormally cold months. Accordingly, its second proposition of law must be rejected.

Appellant argues next that the commission "* * * acted unreasonably and unlawfully in ignoring the overall profitability of Columbia in determining a rate of return." In a rate proceeding under R. C. 4909.34 *et seq.*, where less than the entire service territory of the utility is involved, appellant urges that the rate of return for operations within the relevant area should be determined by the overall rate of return the utility earns from its entire operations.

R. C. 4909.39 specifically makes R. C. 4909.15 applicable to a complaint and appeal brought pursuant to R. C. 4909.34, as was the cause at bar. R. C. 4909.15 mandates, in pertinent part, the following:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, * * * shall determine:

"(1) The valuation as of the date certain of *the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed* and determined. * * *

"(2) A fair and reasonable rate of return to the utility on the valuation as determined in division (A)(1) of this section;

"(3) The dollar annual return to which the utility is entitled by applying the fair and reasonable rate of return as determined under division (A)(2) of this section to the valuation of the utility determined under division (A)(1) of this section." (Emphasis added.)

The above statutory language makes clear that the commission in this instance is to set rates which allow Columbia to recover a reasonable rate of return on the valuation of its property used and useful in rendering service to the Columbus area. Therefore, since Columbia's total company operations is not a controlling factor for purposes of this appeal, appellant's third proposition of law is without merit.

In its fourth proposition of law appellant asserts that, in approving the allocation of various expenses to Columbus general service customers, the commission unreasonably and unlawfully ignored Columbia's favored treatment of its approximately 80 special contract customers in the Columbus area.

With regard to charitable expenses, appellant argues that Columbia's contributions should be allocated to its customers on the basis of the amount of gas purchased, whereas the commission has approved Columbia's method of distributing these costs based upon its total number of customers. Appellant contends that the use of customer ratios is inherently unfair because that method fails to allocate any appreciable portion of the contributions to the 80 special contract customers which, in 1976, consumed approximately two-ninths of the gas sold in the Columbus area. The commission responds that charitable contributions are a "customer-related expense," as the expense is incurred by Columbia in order to create goodwill by benefiting its general service customers and other citizens residing in the service area. Furthermore, the commission argues, it is the social, medical, educational and economic needs of the individual customers, not the special contract customers, which give rise to the need for charitable contributions, whereas the special contract customers, primarily large businesses and institutions, neither create the need for nor directly benefit from such contributions.

Appellant also contends that general service customers were allocated disproportionate shares of the expenses Columbia incurred for advertising and for administrative and

general purposes. With regard to the former expense, the commission explains that a composite, as opposed to pure sales, ratio is a more appropriate formula, because this expense affects Columbia's entire distribution business. With regard to the latter expense, the commission correctly notes that appellant failed to set forth this argument in its application for rehearing, as is required by R. C. 4903.10, and therefore this court need not consider such argument.

Upon review of the foregoing arguments this court is of the opinion that the commission acted reasonably and lawfully in approving Columbia's expense allocation methods.

In its fifth proposition appellant urges that the commission allowed Columbia to assign an unreasonable and unlawful amount as an expense for uncollectibles. Appellant claims that the expense allowed by the commission contained an improper upward adjustment of the test year uncollectibles expense, and that the commission ignored the fact that funds from a special federal program were to be made available to pay heating bills of low income Franklin County residents.

As for the first of appellant's objections in this proposition of law, a commission staff member testified at the hearing on this matter that the disputed adjustment was normally made, so as to reflect the increased uncollectibles that would have been incurred by Columbia if the proposed higher rates had been in effect during the test year. Appellant has not demonstrated to this court that such an adjustment is unreasonable.

Appellant's second objection relates to a $910,177 grant from the Special Crisis Intervention Program of the Federal Community Services Administration. It appears that the commission had several valid reasons for not decreasing the test year uncollectibles expense to reflect funds received under this special program. Among those reasons are the fact that (1) the program was to terminate on August 31, 1977, and thus would not be a constant to be considered

for rate-making purposes; (2) appellant first introduced evidence of this program more than three months after the conclusion of the hearings on this matter, and (3) at the time this evidence was introduced the commission could not have known how much of the funds would be applied to the service area under consideration, or how much of the funds would be used specifically for gas utility bills.

In its final proposition of law appellant argues that the commission unreasonably and unlawfully allowed Columbia to increase expenses for materials at a rate nearly double the percentage of increase indicated by the Consumer Price Index. Appellant suggests that imprudent management can be the only explanation for such significant cost increases, and in connection with this assertion, cites R. C. 4909.154, which requires, in part, that "* * * the public utilities commission shall not allow such operating expenses of a public utility as are incurred by the utility through management policies or administrative practices that the commission considers imprudent."

The very posture of the cause at bar indicates the inapplicability of the above statute, since it is apparent that the commission does *not* consider Columbia's increased expenses to be the result of imprudent management policies. Rather, the commission contends that the Consumer Price Index has no validity as an indicator of changing unit prices which gas utilities experienced in purchasing materials between 1975 and the test year, 1976. In addition, the commission attributes increased expenses for materials not only to inflation, but also to the replacement of depreciated, damaged or stolen equipment needed for existing service. Appellant's final proposition of law must therefore be rejected.

Having considered all the foregoing propositions of law, it is the opinion of this court that the order of the commission in case No. 77-1083 should be affirmed.

II.

In case No. 77-1195 appellant, Columbia Gas of Ohio, Inc., asserts, as its initial proposition of law, that where

the commission develops an allowable return on equity for a public utility which is based solely on the earnings history of the utility's parent, using the discounted cash flow method, it is error for the commission to reduce that allowable return by reference to the utility's own earnings history, since use of those earnings originally would have produced a different allowable return on equity under the discounted cash flow method.

The above contention is based upon the commission's refusal, in the following language, to adopt its staff witness' recommended upward adjustment of 10 percent to his cost of equity determination of 12.80 percent:

"The discounted cash flow method employed by witness Levin has been favored by the Commission in recent years as it yields a reasonable estimate of the required return of the equity investor. However, for purposes of this proceeding, witness Levin adjusted the required return of 12.80 percent resulting from the application of the DCF formula upward by a factor of 1.10 to allow earnings to support a market-to-book ratio of 110 percent * * *. This produced a recommended return on equity of 14.10 percent. Although the methods and data relied on by the other witnesses differ substantially in some respects and were shown to suffer from internal inconsistencies, it is apparent that the question of whether an adjustment is required to restore the integrity of the current shareholder's investment by reversing the currently depressed market-to-book ration [sic] of the parent and to recognize financing costs is primarily responsible for the ultimate difference in the recommendations. Witness Bainter suggests a factor of 1.25 while witness Rothey suggests that only unity is required. The Commission is of the opinion that witness Rothey's recommendation in this regard represents the better view under the circumstances of this case. In recent years, Columbia of Ohio has consistently been the best performer of the System's operating distribution companies. Thus, the Commission believes that it would be unfair to Ohio consumers to attribute the depressed market-to-book

ratio of the parent to Columbia of Ohio through the vehicle of such an adjustment. Further, the recognition of the costs associated with the issuance of common stock is inappropriate where the company presently has no plans to issue additional equity securities. The Commission, therefore, accepts the cost of equity determination of the staff witness of 12.80 percent and, in accordance with the discussion above, finds that a rate of return of 9.81 percent meets the applicable standards set forth in *Bluefield Waterworks Company* v. *Public Utilities [sic Service] Commission*, 262 U. S. 679 (1923) and *Federal Power Commission* v. *Hope Natural Gas Company*, 320 U. S. 591 (1944) and should be approved."

The General Assembly has recently enacted into law Am. Sub. S. B. No. 94, effective September 1, 1976, wherein Ohio's reconstruction cost new, less depreciation, rate base has been replaced with a net investment, or original cost, rate base. As set forth in R. C. 4909.05 and 4909.15(A)(1), the new rate base consists of the actual net investment in the assets of a utility, including the original cost of long term assets [R. C. 4909.05(C), (D), (E), (F), and (G)], less depreciation and contributions of capital [R. C. 4909.05 (H) and (I)], plus short term assets in the form of cash working capital [R. C. 4909.15(A)(1)]. Because under the new rate law the commission is required to relate the "fair and reasonable rate of return" specified in R. C. 4909.15(A) (2) to the net investment in the utility [see R. C. 4909.15 (A)(3)], it is no longer the law in Ohio that the commission may not consider that investment or the total capitalization of the utility in fixing a fair and reasonable rate of return. R. C. 4909.155 specifically authorizes the commission to consider total capitalization in fixing the just and reasonable rates required by Ohio law. As a result, the commission may consider the return on book equity, *i. e.*, the return on the percenatge of the original cost rate base, financed or capitalized by the sale of common stock, in setting a reasonable rate of return. Similarly, the commission may consider the market-to-book ratio of the utility's stock as an

indicator of whether the company is earning, on the equity portion of its original cost rate base, the required return of the equity investor.

Upon consideration of the facts of this cause, as set out in the above excerpt from the commission's order of June 29, 1977, this court concludes that it was reasonable and lawful for the commission to refuse to award any premium above the required return of the equity investor in Columbia Gas Systems, Inc., in fixing the cost of equity of Columbia Gas of Ohio, Inc., for this proceeding. Accordingly, appellant's first proposition of law is rejected.

In its second and third propositions of law appellant suggests that the commission erred by refusing to adjust certain test period data for known and measurable cost levels existing at the end of the test period, and by disallowing a proposed allowance for attrition of earnings.

Prior to the enactment of Am. Sub. S. B. No. 94 it was not uncommon for rates set by the commission to be based upon test periods which preceded by three or four years the time at which the new rates would be effective. To remedy the problem created by rates based upon stale information the commission often permitted adjustments to the test period data. R. C. 4909.15(C) represents a legislative response to this type of regulatory lag, and with the resultant reduction of processing time under the new statute the distorting effects of inflation upon test year data have been greatly reduced. Indeed, in this cause Columbia's application was filed on September 1, 1976, the calendar year 1976 was established as the test period, at Columbia's request, and the new rates fixed by the commission took effect on August 5, 1977. Thus, the new rates were based upon data from a test period which had ended a mere seven months before the rates became effective.

"Where, in a proceeding properly brought before it, the Public Utilities Commission fixes the rates or charges which may be collected by a public utility in furnishing its services or products to the users or consumers thereof, a presumption exists that such rates or charges are fair and rea-

sonable, and a party who contends otherwise has the burden on appeal to the Supreme Court under Section 4903.13, Revised Code, of showing that they are unjust, unreasonable or unlawful." *Columbus* v. *Pub. Util. Comm.* (1959), 170 Ohio St. 105, paragraph two of the syllabus.

We conclude that Columbia has not shown that the commission acted unreasonably or unlawfully in denying the proposed adjustment to test period data or the proposed attrition adjustment. Therefore, appellant's second and third propositions of law are rejected.

In its fourth proposition of law appellant argues that the commission unlawfully delayed the effective date of the new rates beyond the time limitation prescribed by R. C. 4909.42.

R. C. 4909.42 provides, in part:

"If the proceeding on an application filed with the * * * [commission] under section 4909.18 of the Revised Code by any public utility requesting an increase on any rate * * * has not been concluded and an order entered pursuant to section 4909.19 of the Revised Code at the expiration of two hundred seventy-five days from the date of filing the application, the proposed increase shall go into effect upon the filing of an undertaking by the public utility in an amount as the commission determines. * * *"

The parties apparently agree that although appellant's application was filed on September 1, 1976, the disputed time limitation did not begin to run until the October 1, 1976, effective date of the above statute. Thus, the commission's order of June 29, 1977, was issued prior to the expiration of the 275-day limit, which occurred on July 1, 1977. Appellant points out, however, that before it was authorized to charge under the new rates the commission had to approve tariffs filed pursuant to the order, and appellant was required to give its customers a 30-day notice of the new rates. It is appellant's position that when the new rates ultimately became effective, on August 5, 1977, the statutorily mandated time period had been exceeded.

The clear language of R. C. 4909.42 provides that the

utility can place its proposed rate increase into effect at the expiration of 275 days after the filing of its application if the proceeding on the application "has not been concluded and an order entered pursuant to section 4909.19 of the Revised Code." There is no dispute that the proceeding on Columbia's application had concluded prior to the expiration of the time limit. The only remaining question is whether the commission's order of June 29, 1977, was an order entered pursuant to R. C . 4909.19.[4]

The record reveals that the commission's order of June 29, 1977, was preceded by Columbia's complaint for a rate increase, a commission staff investigation and report thereon, and a hearing upon written objections to the staff report. It is therefore clear that the resulting order was

---

[4]R. C. 4909.19 provides, in pertinent part, as follows:

"Upon the filing of any application for increase provided for by section 4909.18 of the Revised Code the public utility shall forthwith publish the substance and prayer of such application, in a form approved by the public utilities commission, once a week for three consecutive weeks in a newspaper published and in general circulation throughout the territory in which such public utility operates and affected by the matters referred to in said application, and the commission shall at once cause an investigation to be made of the facts set forth in said application and the exhibits attached thereto, and of the matters connected therewith. Within a reasonable time as determined by the commission after the filing of such application, a written report shall be made and filed with the commission, a copy of which shall be sent by registered mail to the applicant, the mayor of any municipal corporation affected by the application, and to such other persons as the commission deems interested. ** *

"If objections are filed with the commission within thirty days after the filing of such report, the application shall be promptly set down for hearing of testimony before the commission or be forthwith referred to an attorney examiner designated by the commission to take all the testimony with respect to the application and objections which may be offered by any interested party. * * *

"When the taking of testimony is completed, a full and complete record of such testimony noting all objections made and exceptions taken by any party or counsel, shall be made, signed by the attorney examiner, and filed with the commission. Thereafter, the commission shall make such order respecting the prayer of such application as seems just and reasonable to it."

entered pursuant to R. C. 4909.19, since it was an order "respecting the prayer of such application as seems just and reasonable to * * * [the commission]." Accordingly, appellant could not have availed itself of the special provision of R. C. 4909.42, notwithstanding the fact that the commission imposed a 30-day period of notice before the approved rates became effective.

In its final proposition of law appellant contends that the commission's disallowance of an automatic adjustment for increases in the Ohio excise tax from the purchased gas adjustment clause was arbitrary and discriminatory.

The commission indicated, in its June 29, 1977, order, that it was then considering, in another pending case, the implementation of a uniform purchased gas adjustment clause to remedy the problem to which appellant here refers. Apparently, the commission intends to implement such a uniform adjustment on an industry-wide basis, thereby eliminating the irregular allowance of this adjustment. In light of this consideration appellant's final proposition of law is without merit.

Being neither unreasonable nor unlawful, the order of the commission in case No. 77-1195 is hereby affirmed.

*Order affirmed in case No. 77-1083.*
*Order affirmed in case No. 77-1195.*

O'NEILL, HERBERT, W. BROWN, STRAUSBAUGH and COOK, JJ., concur.

LOCHER, J., concurs in case No. 77-1195, and concurs in part and dissents in part in case No. 77-1083.

STRAUSBAUGH, J., of the Tenth Appellate District, sitting for P. BROWN, J.

COOK, J., of the Eleventh Appellate District, sitting for SWEENEY, J.

LOCHER, J., concurring in part and dissenting in part in case No. 77-1083. I must respectfully dissent from the majority's resolution in case No. 77-1083 of appellant's contention that the Public Utilities Commission (commission) in approving the allocation of Columbia Gas of Ohio, Inc. (Columbia), of its charitable contributions to its Columbus general service customers unlawfully and unreasonably ignored Columbia's favored treatment of approximately 80 of its special contract customers in the Columbus area.

At the outset, although cognizant that it was not specifically challenged in this cause, I am constrained to question the propriety of allowing any public utility in Ohio to recoup its charitable contributions from its customers. The Alabama Supreme Court in a recent decision, *Alabama Power Co.* v. *Alabama Public Service Comm.* (Ala. 1977), CCH Pub. Util. Law Rptr., New Matters, held that charitable contributions are not a proper operating expense for a utility. In so holding, that court expressed its reasoning, with which upon contemplation I find myself in concurrence, in the following statement:

"While charitable contributions are commendable, we are not aware of any reason why the consumer should make the contribution as opposed to the investor. Logic tells us that charitable contributions are not operating expenses. The company, being a monopoly, can operate without deducting charitable donations."

A close examination reveals no compelling uniqueness in Ohio that would justify reaching a result contrary to that pronounced in Alabama. The public utilities in this state enjoy a monopoly, and thus why the consumer and not the investor bears the burden of the contribution is unfathomable. Assuredly, these donations are not made at the specific behest of the consumers, nor is the choice of the recipients a product of their volition. In fact, it would appear that the authority to control these decisions is posited with the utility's investors, not its consumers.

Irrespective of the propriety of a public utility charging its customers for its charitable contributions, the com-

mission's approval of Columbia's allocation of these donations almost entirely to its general service customers and thereby excluding its special contract customers from the cost of these contributions is neither reasonable nor lawful. This was accomplished because the allocation of the contributions was not based upon the amount of gas purchased but upon the total number of customers. The net effect of this allocation, as urged by appellant, when applied to the facts of this case, is that the general service customers who used 78.22 percent of the gas consumed in the Columbus area paid $73,589.79 of a total of $73,613.00 or 99.97 percent of the charitable contributions, whereas the special contract customers in the Columbus area used 21.78 percent of the gas consumed, but paid only .03 of one percent (translated into dollars and cents = $23.21) of the charitable donations.

To explain this gross disparity, the commission stated that charitable contributions are "customer-related expenses" benefiting Columbia's general service customers and that the special contract customers, mostly large businesses and institutions, neither create the need for nor directly benefit from such contributions. To find that these special customers, large businesses and institutions, do not benefit from the charitable contributions but that the other customers do is to engage in a myopic examination of reality. Businesses and institutions are affected in innumerable ways by their environs. Thus, these contributions, in having a positive effect on the community and the general customers, similarly benefit the resident businesses and institutions, perhaps in a different manner and even to a different degree. But, this benefit can in no way be as negligible as the allocation formula provides. Absent substantial proof, I do not find that this unsubstantiated inference of non-benefit to the special contract consumers reflected in Columbia's allocation of its charitable contributions is either lawful or reasonable.