OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

City of Cincinnati, Appellant, v. Public Utilities Commission of Ohio et al., Appellees.

[Cite as Cincinnati v. Pub. Util. Comm. (1993), ___ Ohio St.3d ___.]

Public Utilities Commission — Conversion of nuclear power plant to coal-fired facility — Application for rate increase — Commission properly rejected equivalent plant standard for valuing rate base, when — Owner-utilities' decision to convert to coal-fired facility found to be prudent, when — Allowance for construction work in progress — Amended R.C.

4909.15(A)(1) pertains only to revenues collected after April 10, 1985 — Court will not substitute its judgment for that of the commission as to which of the fairly debatable valuation periods is the most representative in determining company's cost of common equity.

(No. 92-2101 — Submitted June 2, 1993 — Decided November 3, 1993.)

Appeal from the Public Utilities Commission of Ohio, No. 91-410-EL-AIR.

In 1969, intervening appellee Cincinnati Gas & Electric Company ("CG&E"), Columbus Southern Power Company ("CSP") (formerly Columbus & Southern Ohio Electric Company) and Dayton Power & Light Company ("DP&L") entered into a joint venture to construct the William H. Zimmer Nuclear Power Station ("Zimmer"). On November 12, 1982, after numerous construction delays, the Nuclear Regulatory Commission suspended all safety-related construction at the site. By agreement dated January 20, 1984, the joint owners canceled the Zimmer project as a nuclear plant and agreed to use their best efforts to convert Zimmer to a coal-fired facility. On August 1, 1984, they announced that Zimmer would be converted to a 1,300 megawatt ("MW") coal-fired plant.

On October 23, 1984, appellee, Public Utilities Commission of Ohio ("the commission"), initiated In the Matter of the Restatement of the Accounts and Records of The Cincinnati Gas & Electric Company, The Dayton Power & Light Company, and Columbus & Southern Ohio Electric Company, PUCO No. 84-1187-EL-UNC, to determine the portion of the existing Zimmer investment which may not be used and useful in a converted coal-fired plant and/or the

impact of imprudence or mismanagement, if any, on the level of the Zimmer investment. On October 1, 1985, the parties to that proceeding, except appellant city of Cincinnati ("the city") and the Board of Commissioners of Hamilton County, entered into a stipulation which resolved that case. The stipulation generally provided (1) that $861,000,000 of capital invested in the Zimmer facility would be disallowed in the owner utilities' future rate cases; (2) that the investment remaining as of January 31, 1984, i.e., the "remaining sunk costs" (including an allowance for funds used during construction ["AFUDC"] properly accrued thereon subsequent to January 31, 1984), would not be challenged by the parties as being the result of mismanagement or as not being used and useful in a Zimmer facility converted to coal generation; (3) that the non-owner parties reserved the right to challenge the reasonableness of any decision subsequent to the decision to cancel construction of Zimmer as a nuclear plant in any future proceeding before the commission; and (4) that the total Zimmer investment that the owners could request to be included in a future rate proceeding would be capped at $3.6 billion. The commission unanimously approved the stipulation on November 26, 1985, after conducting a series of public hearings as to its reasonableness, and upon consideration of the city's testimony and arguments opposing its adoption. The city did not appeal the commission's order.

Zimmer was successfully converted to a 1,300 MW coal-fired plant at a total cost of $3.069 billion and has been providing service since March 30, 1991. On April 2, 1991, the owner utilities each filed an application to increase their rates for electric service, in large part to receive a return on the

respective portion of their investment in Zimmer. CG&E requested that its jurisdictional share of the facility be fixed at $1,216,610,000. The city was granted leave to intervene in CG&E's rate case, and challenged CG&E's proposed Zimmer valuation.

By its order issued May 12, 1992, the commission reduced CG&E's requested rate-base allowance by $229,868,000, specifically excluding improperly accrued AFUDC on the remaining sunk costs, as well as nuclear-related costs deemed not used and useful in the converted facility. (See the companion cases of Cincinnati Gas & Elec. Co. v. Pub. Util. Comm. [1993], 67 Ohio St.3d 517, 620 N.E.2d 821, and Columbus S. Power Co. v. Pub. Util. Comm. [1993], 67 Ohio St.3d 535, 620 N.E.2d 835, decided this date.) The commission also rejected the city's alternative valuation proposals.

The cause is now before this court upon an appeal as a matter of right.

_____

Fay D. Dupuis, City Solicitor, and Richard Ganulin, Assistant City Solicitor, for appellant.

Lee I. Fisher, Attorney General, James B. Gainer, Duane W. Luckey, William L. Wright and Jeffrey D. Van Niel, Assistant Attorneys General, for appellee.

Squire, Sanders & Dempsey, Alan P. Buchmann, Arthur E. Korkosz and Lisa R. Battaglia; James J. Mayer and Michael A. Gribler, for intervening appellee CG&E.

_____

Per Curiam. The city argues that the commission erred: (1)

in determining Zimmer's reasonable original cost, including failing to make a prudence adjustment to CG&E's Zimmer rate base; and (2) in using a twelve-month average stock price to estimate CG&E's cost of common equity. For the reasons which follow, we reject these arguments and affirm the commission's order.

## I. REASONABLE ORIGINAL COST

### A. Equivalent Plant Standard

R.C. 4909.15 and 4909.051 require the commission to ascertain the reasonable original cost of a utility's used and useful property for ratemaking purposes. In doing so in this case for the converted Zimmer facility, the commission separated the cost of the plant, in accordance with the 1985 stipulation, into four distinct parts and included in rate base: (1) the sunk costs remaining as of January 31, 1984, which were stipulated to be used and useful in the converted coal-fired plant; (2) the AFUDC properly accrued on the sunk costs; (3) the portion of the post-cancellation conversion costs (i.e., the "going forward costs") determined to be used and useful in this proceeding; and (4) the AFUDC on those costs. While the city concedes that the commission properly determined the reasonableness of the used and useful conversion costs and associated AFUDC in this proceeding, it contends that the commission erred by not considering the reasonableness of the otherwise allowable sunk costs. The commission and CG&E generally contend that such a reasonableness analysis of the remaining sunk costs is prohibited by the 1985 stipulation. We agree.

The stipulation was crafted to provide for a dollar disallowance for "nuclear" Zimmer, rather than a consideration of specific plant items, in order to accommodate settlement and to

avoid the need for an arduous "brick by brick" audit of specific plant items. Accordingly, the stipulation does not distinguish between the specific plant items deemed used and useful in a converted Zimmer facility, and those which were included in the $861 million disallowance. There being no means to identify or challenge the pre-January 31, 1984 plant stipulated to be used and useful in a converted Zimmer, it necessarily follows that the stipulation prohibits inquiry into the "reasonableness" of these otherwise allowable sunk costs. Indeed, in its 1985 order approving the stipulation, the commission recognized that only the reasonableness of the "going forward costs to complete the converted [Zimmer] facility" were left open to challenge in the instant proceeding. The city did not appeal that order and is now bound by it.

Recognizing that the specific plant items represented by the sunk costs are beyond review in this proceeding, the city based its alternative Zimmer valuation (including the remaining sunk costs and the conversion costs) upon the present value of the allegedly comparable Rockport Power Plant in Indiana.[2] The commission rejected the city's proposal as being contrary to the original cost rate-base valuation required by R.C. 4909.05.

We have recognized that a utility's rate base under the original-cost standard is based upon the actual investment in the assets of the utility. Babbit v. Pub. Util. Comm. (1979), 59 Ohio St.2d 81, 89-90, 13 O.O.3d 67, 72, 391 N.E.2d 1376, 1381; Franklin Cty. Welfare Rights Org. v. Pub. Util. Comm. (1978), 55 Ohio St.2d 1, 11, 9 O.O.3d 1, 6, 377 N.E.2d 990, 997. Clearly, the city's proposed Zimmer rate-base valuation, based upon the

cost of an allegedly comparable plant adjusted to price levels at the time of valuation, violates the statutory original cost standard and is unlawful under R.C. 4909.05(E).3

The city also argues that the AFUDC accrued on the remaining sunk costs is not a "reasonable" cost of Zimmer and should be excluded in its entirety from rate base. As set forth more fully in the companion cases of Columbus S. Power, supra, and Cincinnati Gas & Elec. Co., supra, the 1985 stipulation explicitly provided for the allowance of such AFUDC in this proceeding, subject only to its "proper accrual" under established accounting conventions. Having determined in those cases that the commission's allowance of AFUDC on these sunk costs from March 1986 until completion of the Zimmer facility was neither unreasonable nor unlawful, we reject this argument.

Accordingly, we conclude that the commission properly rejected the city's equivalent-plant standard for valuing rate base and that it properly determined Zimmer's valuation within the constraints imposed by the 1985 stipulation.

B. Prudence

While the 1985 stipulation prevented inquiry into the reasonableness of the remaining sunk costs, it expressly left open to challenge in this proceeding whether the owner-utilities' decision to convert Zimmer to a coal-fired facility was prudent. We adopt the commission's definition of a prudent decision, which is in accord with that used in other jurisdictions,4 as "one which reflects what a reasonable person would have done in light of conditions and circumstances which were known or reasonably should have been known at the time the decision was made." In the Matter of the Investigation into the Perry Nuclear

Power Station (Jan. 12, 1988), PUCO No. 85-521-EL-COI, at 10-11. The standard contemplates a retrospective, factual inquiry, without the use of hindsight judgment, into the decisionmaking process of the utility's management. See Re Syracuse Home Util. Co. (Dec. 30, 1986), PUCO No. 86-12-GA-GCR; Re Toledo Edison Co. (July 16, 1987), PUCO No. 86-05-EL-EFC.

The issue central to the prudence inquiry below was whether CG&E, in 1984, could have written off its entire Zimmer investment and still have had sufficient access to the capital markets to enable it to construct an arguably less costly generating facility in time to meet its customers' forecasted energy needs in 1991. The construction options under consideration included, inter alia, building a coal-fired plant at a new ("greenfield") site or adding an additional coal-fired generating unit at an existing facility, owned by CG&E and DP&L, at East Bend, Kentucky.

Although the commission found that CG&E's decisionmaking process was "less than adequate," and made a corresponding downward adjustment to the company's rate of return, it refused to make a prudence adjustment to CG&E's Zimmer rate base. Specifically, the commission found that an adjustment was not warranted because the rate-base exclusions related to AFUDC, nuclear fuel, and nuclear wind-down costs (nearly $230 million in this case), as well as the $861 million disallowance required by the 1985 stipulation (approximately $400 million in this case), reduced Zimmer's valuation to the range of costs to construct an alternative plant at a greenfield site. Further, it found that the East Bend option was not a viable alternative, primarily

because CSP did not own an interest in the site and also because CG&E's abandonment of its contractual obligation to pursue construction at Zimmer could have resulted in costly and extensive litigation, the outcome of which would be uncertain. By this appeal, the city argues that East Bend was a viable, lower-cost alternative to Zimmer's conversion, that a prudent utility manager would have selected that option over conversion of the nuclear facility, and that the Zimmer rate-base valuation should be reduced to the East Bend unit's cost of construction.

The narrow question presented, whether East Bend is a viable alternative, is one of fact. On questions of fact, this court will not reverse an order of the commission absent a showing that it is manifestly against the weight of the evidence, and is so unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780.

We begin our review by noting that, having embarked on a joint venture to construct the Zimmer nuclear facility, the owner-utilities could not have considered the alternatives to completion of that facility in a vacuum. It is undisputed on the record in this proceeding that, in 1984, the joint owners collectively needed the 1,300 MW of electricity that a converted Zimmer facility would provide to meet their customers' forecasted energy needs in 1991.[5] Obviously, had any one of the owner-utilities unilaterally abandoned its Zimmer commitment, protracted litigation could have followed, which, as it pertains to this issue, could not only have affected CG&E's financial ability to pursue the East Bend option but, just as important, could have prevented completion of that facility in time to meet

its customers' forecasted energy needs.

The city argues that CG&E could have completed an East Bend facility in 1991 to replace the capacity that otherwise would have been provided by the converted Zimmer facility. It relies on the testimony of its expert financial witness that it was feasible for the company to accelerate completion of the East Bend unit from 1998 (as assumed by a study conducted by the First Boston Corporation for CG&E) to 1991. However, the witness's testimony addressed only the financial feasibility of accelerating construction and admittedly did not take into consideration the company's capacity needs for the 1980s and 1990s, or the engineering, contractual and legal impediments to selecting that site. CG&E's witness testified that, assuming these barriers were overcome, and even assuming the absence of financial constraints in constructing a unit at East Bend, the unit could not have been placed in service until 1995 or later due, in part, to state (Ohio and Kentucky) and federal licensing and permitting requirements.

The city also argues that sufficient blocks of power could have been purchased from other utilities and were available for 1991 to meet CG&E's customers' energy needs until the East Bend unit was placed into service. However, the city's witness on this issue admitted that his conclusion, based on 1991 forecasted data, relied upon hindsight judgment and was not intended as a part of a prudence analysis of what the utilities knew or should have known at the time the decision to convert was made. According to the company's analyses and the analyses of the commission's staff, based upon data available at the time

the decision to convert was made, such large amounts of bulk power had an uncertain availability for the 1990s and beyond due to existing low reserves in surrounding regions, the anticipated curtailment of generation expansion and the effects of acid rain legislation.[6]

We find that the record supports the commission's determination that the East Bend option was not a viable alternative to Zimmer's conversion and reject the city's proposition of law.

C. CWIP Offset

Between 1980 and 1983, the commission granted CG&E an allowance for construction work in progress ("CWIP") related to Zimmer's construction as a nuclear facility. There is no dispute that these allowances were lawful under then-existing R.C. 4909.15(A)(1), or that they were collected by CG&E by April 11, 1983.

The city argues that the commission erred by not using these lawfully authorized and lawfully collected revenues to offset CG&E's rate base in this proceeding. While R.C. 4909.15(A)(1) was amended in 1985 to provide for such offsets, it pertains only to revenues collected after April 10, 1985. Am.Sub.S.B. No. 27, 140 Ohio Laws, Part I, 58. There being no authority to offset the revenues in question, we reject the city's argument.

## II. RATE OF RETURN

The issue presented by the city's final proposition of law is whether it was reasonable for the commission to use CG&E's average test-year stock price, as recommended by its staff, in determining CG&E's cost of common equity and, ultimately, its overall rate of return.[7] The city points to the rise in CG&E's

stock price during the second half of 1991 and argues that the first six months' data is unrepresentative of current market trends and conditions. It argues that either the six-month or twelve-month average as of the issuance of the commission's May 12, 1992 order is more representative and should have been adopted by the commission. The commission found that the city's recommendation was based upon post-record data and refused to adopt it. We find the commission's determination to be neither unreasonable nor unlawful.

Alternatively, the city argues that the six-month average as of the close of hearing in mid-February 1992 should have been adopted as being more representative. The commission rejected the various short-term valuation periods (ranging from one to six months) recommended by the experts testifying on this issue, noting that it traditionally uses a twelve-month average in order to minimize the effects of short-term market fluctuations. Finding no anomalous conditions (e.g., a stock price break or market break) which would make the twelve-month average unrepresentative in this proceeding, the commission adopted its staff's recommendation.

We refuse to substitute our judgment for that of the commission as to which of the fairly debatable valuation periods is the most representative in determining the company's cost of common equity. See AT&T Communications of Ohio, Inc. v. Pub. Util. Comm. (1990), 51 Ohio St.3d 150, 555 N.E.2d 288; Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1976), 46 Ohio St.2d 105, 75 O.O.2d 172, 346 N.E.2d 778. The commission's determination, based upon its staff's recommendation, is supported by the record

and is neither unreasonable nor unlawful. Accordingly, we affirm the decision of the commission on this issue.

Order affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Wright, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

FOOTNOTES:

1. R.C. 4909.15(A)(1) requires the commission, in fixing rates, to determine "[t]he valuation as of the date certain of the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) of section 4909.05 of the Revised Code.* * *"

R.C. 4909.05(J) provides that the valuation of a utility's property shall include the original cost of long-term assets (R.C. 4909.05[C], [D], [E], [F], and [G]) less depreciation and contributions of capital (R.C. 4909.05[H] and [I]). The Zimmer investment at issue falls under R.C. 4909.05(E), which provides that the "original cost" of such property "shall be the cost, as determined to be reasonable by the commission, to the person that first dedicated the property to the public use and shall be set forth in property accounts and subaccounts as prescribed by the commission.* * *"

2. The city also alleges that the commission used such an "empirical benchmark," albeit an erroneous one, in determining Zimmer's valuation. While the commission considered the cost to construct an alternative plant, it did so in the context of determining whether a further rate-base adjustment should be made when considering the prudence of CG&E's decision to convert, not

in considering whether the specific costs to construct Zimmer were reasonable.

3. Three general methods are recognized in valuing utility property: (1) original cost, which values existing plant and additions based upon the actual cost to the person that first dedicated the property to the public use; (2) reproduction cost new ("RCN"), which values existing plant and additions at the estimated price levels prevailing at the date of valuation; and (3) fair value, which considers a property's original cost and current value, sometimes assigning weights to the two. See Phillips, The Regulation of Public Utilities (2 Ed.1988) 304, 324; Priest, Principles of Public Utility Regulation (1969) 140-141; Rose, Confusion in Valuation for Public Utility Rate-making (1962), 47 Minn.L.Rev. 1. The city's alternative valuation is more akin to the RCN standard, which was formerly prescribed by Ohio statute, but which has been replaced by the original cost standard in 1976. See Babbit, supra, 59 Ohio St.2d at 89, 13 O.O.3d at 72, 391 N.E.2d at 1381.

4. See Phillips, The Regulation of Public Utilities (2 Ed.1988) 326.

5. CG&E's share of the converted Zimmer is approximately 600 MW, DP&L's share is approximately 325 MW, and CSP's share is approximately 375 MW.

6. The city also points to other references in the record as to the availability of purchased power. Specifically, it argues that American Electric Power Corporation (CSP's parent) had arranged to provide CG&E with backup power; however, that offer was made as a part of the January 20, 1984 agreement to convert

Zimmer and extended only during the term of Zimmer's construction. The city also points to a power sale proposal from the Tennessee Valley Authority; however, the record does not reflect that the proposal would satisfy the amount or duration of power needed by CG&E, not to mention the needs of the other owners. Finally, the city notes three other power sales in the region executed in 1981, 1987 and 1990. Of course, the 1981 sale could not be considered as available for CG&E and the other owners at the time the decision to convert was made, and the availability of the latter two are based upon a hindsight analysis. None provided the amounts of power needed as a Zimmer replacement.

7. In determining the cost of common equity, the commission customarily, as here, employs the discounted cash flow ("DCF") model which, generally stated, estimates the required cost of common equity by adding the current dividend yield (dividend divided by representative stock price) and expected dividend growth rate.