**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re OVEC Generational Purchase Rider Audits Required by R.C. 4928.148*, Slip Opinion No. 2026-Ohio-2382.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2382

IN RE THE OVEC GENERATION PURCHASE RIDER AUDITS REQUIRED BY R.C. 4928.148 FOR DUKE ENERGY OHIO, INC., DAYTON POWER AND LIGHT COMPANY, AND OHIO POWER COMPANY; OHIO ENVIRONMENTAL COUNCIL AND OHIO MANUFACTURERS' ASSOCIATION ENERGY GROUP, APPELLANTS; PUBLIC UTILITIES COMMISSION, APPELLEE; DUKE ENERGY OHIO, INC., DAYTON POWER AND LIGHT COMPANY, AND OHIO POWER COMPANY, INTERVENING APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re OVEC Generational Purchase Rider Audits Required by R.C. 4928.148*, Slip Opinion No. 2026-Ohio-2382.]**

*Public Utilities—Public Utilities Commission did not commit reversible error in deciding that a must-run strategy for operating legacy-generation resource was prudent—Commission did not err in allowing electric-distribution-utility companies to recover costs charged through legacy-generation-resource rider during audit period—Commission did not violate R.C. 4928.148 by refusing to disallow and refund certain costs—By providing*

*ample record citation to support the factual basis for its determinations, commission did not violate R.C. 4903.09—Commission's error in applying presumption of prudence did not result in reversible error—Orders affirmed.*

(No. 2024-1733—Submitted December 9, 2025—Decided June 25, 2026.)

APPEAL from the Public Utilities Commission, No. 21-477-EL-RDR.

_____

SHANAHAN, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, BRUNNER, BEATTY BLUNT, and HAWKINS, JJ., joined. LAUREL BEATTY BLUNT, J., of the Tenth District Court of Appeals, sat for DETERS, J.

**SHANAHAN, J.**

{¶ 1} R.C. 4928.148, which became effective in October 2019,[1] requires the Public Utilities Commission of Ohio to establish a replacement nonbypassable-rate mechanism[2] for the retail recovery of prudently incurred costs of electric-distribution utilities related to a legacy-generation resource for the period January 1, 2020, through December 31, 2030. R.C. 4928.148(A). The statute also requires the commission to determine the prudence and reasonableness of the actions and decisions of the electric utilities with ownership interests in legacy-generation resources. R.C. 4929.148(A)(1).

{¶ 2} Duke Energy Ohio ("Duke"), the Dayton Power and Light Company, d.b.a. AES Ohio ("AES Ohio"), and Ohio Power Company, d.b.a. AEP Ohio ("AEP

_____

1. The General Assembly repealed R.C. 4928.148 in 2025 Sub.H.B. No. 15 (effective Aug. 14, 2025). This opinion applies the version of the statute that was enacted in 2019 Am.Sub.H.B. No. 6 (effective Oct. 22, 2019).

2. A nonbypassable-rate mechanism is a charge that is paid by all customers and cannot be avoided by customers who purchase retail electric-generation service on the competitive market. *See In re Application of Columbus S. Power Co.*, 2016-Ohio-1608, ¶ 6 (defining "nonbypassable" as "meaning that [the charge] is paid by both shopping and nonshopping customers in [an electric-distribution company's] service territory").

Ohio") (collectively, "the companies") are electric-distribution utilities as defined by R.C. 4928.01(A)(6). In 2019, the commission established the legacy-generation-resource rider ("LGR Rider") in accordance with R.C. 4928.148. The LGR Rider replaced the existing mechanisms that the companies had been using to recover prudently incurred costs associated with their interest in and operation of the Ohio Valley Electric Corporation ("OVEC"), a legacy-generation resource under Ohio law, R.C. 4928.01(A)(41).[3]

{¶ 3} As part of the review required by R.C. 4928.148(A)(1), the commission directed audits to be conducted to determine the prudence and reasonableness of the LGR Riders of the companies for January 1 through December 31, 2020. The commission appointed a third-party auditor to assist with the prudence and performance audits, and after review, the commission issued an order approving and adopting the audits, PUCO No. 21-477-EL-RDR, 2024 WL 4039780, ¶ 125 (Aug. 21, 2024), except for the auditor's recommendation for a cap on capital expenditures, *id.* at ¶ 110. The Ohio Environmental Council ("OEC") and the Ohio Manufacturers' Association Energy Group ("OMAEG") jointly filed an application for rehearing (along with other parties that did not file in this court), and the commission issued an entry on rehearing. OEC and OMAEG separately appealed the commission's decisions. Appellants maintain that the commission's orders are unlawful and unreasonable because they allowed the companies to recover unreasonable or imprudently incurred costs related to the OVEC generation plants.

{¶ 4} For the reasons explained in detail below, we affirm the commission's orders.

---

3. The General Assembly amended R.C. 4928.01 in 2025 Sub.H.B. No. 15 (effective Aug. 14, 2025). This opinion applies the version of the statute enacted in 2019 Am.Sub.H.B. No. 6 (effective Oct. 22, 2019).

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 5} Several regional investor-owned utilities ("the sponsoring companies") formed OVEC in 1952 to provide electric service to a uranium-enrichment facility in southern Ohio under a power-supply agreement between OVEC and the federal government to serve a United States Department of Energy facility. Under Ohio law, OVEC is a legacy-generation resource. *See* R.C. 4928.01(A)(41) (defining "[l]egacy generation resource" as "all generating facilities owned . . . by a corporation that was formed prior to 1960 by investor-owned utilities for the original purpose of providing power to the federal government for use in the nation's defense or in furtherance of national interests, including the Ohio valley electric corporation"). There are two OVEC generation facilities: Clifty Creek Station, which includes six coal-fired generation plants, and Kyger Creek Station, which includes five coal-fired generation plants.

{¶ 6} The companies are parties to the OVEC power agreement—referred to as the "InterCompany Power Agreement"—and are entitled to a certain percentage of OVEC's energy and capacity and are responsible for the same share of OVEC's costs. Under the original OVEC power agreement, the companies agreed to purchase certain energy and capacity produced by OVEC in excess of that required to serve the Department of Energy facility. The Department of Energy terminated its power-supply agreement with OVEC in 2003, and thereafter the companies became entitled to all of OVEC's net energy and capacity under the terms of the InterCompany Power Agreement. The InterCompany Power Agreement was amended and restated in 2010 to extend its term from March 2026 to June 2040.

{¶ 7} In a separate proceeding in 2019, the commission established the LGR Rider as the replacement nonbypassable-rate mechanism required under R.C. 4928.148(A) to allow electric-distribution utilities to recover from their retail customers the prudently incurred costs related to legacy-generation resources for

January 1, 2020, through December 31, 2030. *In re Establishing the Nonbypassable Recovery Mechanism for Net Legacy Generation Resource Costs Pursuant to R.C. 4928.148*, PUCO No. 19-1808-EL-UNC, 2019 Ohio PUC LEXIS 1465 (Nov. 21, 2019). The LGR Rider replaced the existing mechanisms that the companies had been using to recover the prudently incurred costs associated with their interest in and operation of OVEC. *Id.* at ¶ 4, 32-33.

{¶ 8} R.C. 4928.148(A)(1) requires the commission to retrospectively evaluate the ongoing prudence and reasonableness of the companies' actions pertaining to their ownership interests in OVEC. Under this provision, during 2021, the commission must make its initial determination regarding the prudence and reasonableness of such actions during calendar year 2020. And the commission is required to make determinations again in 2024, 2027, and 2030 for such actions during the three calendar years that preceded the year in which the determination is made.

{¶ 9} As required under R.C. 4928.148(A)(1), the commission opened the instant case in 2021 to review the prudence and reasonableness of the companies' OVEC actions during calendar year 2020. To that end, the commission selected London Economics International, L.L.C., to conduct audits of the companies' LGR Riders for January 1, 2020, through December 31, 2020. Thereafter, an auditor performed the audits for the LGR Riders of the three companies, and these audits were filed.

{¶ 10} An attorney examiner granted motions to intervene filed by several parties, including OEC and OMAEG. An evidentiary hearing before two administrative-law judges (collectively, "ALJ") began on October 31, 2023, and concluded on November 6, 2023.

{¶ 11} In August 2024, the commission issued an opinion and order approving the audits and adopting all of the auditor's recommendations except for the recommendation that the commission institute a cap on capital expenditures.

2024 WL 4039780 at ¶ 110, 125. In doing so, the commission determined that all costs and sales flowing through the companies' LGR Riders for the audit period were prudent and reasonable. Accordingly, the commission found that no costs recovered through the companies' LGR Riders should be disallowed.

{¶ 12} In a subsequent order, the commission denied OMAEG and OEC's joint application for rehearing. OMAEG and OEC filed separate notices of appeal challenging the commission's orders. We granted AEP Ohio's, Duke's, and AES Ohio's motions to intervene as appellee. 2025-Ohio-86; 2025-Ohio-561; 2024-1733.

## II. STANDARD OF REVIEW

{¶ 13} R.C. 4903.13 provides that a commission order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, we find the order to be unlawful or unreasonable. *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 2004-Ohio-6767, ¶ 50. The appellant bears the burden of demonstrating that the commission's decision is unlawful or unreasonable. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154 (1990).

{¶ 14} A commission order is unlawful if it rests on an erroneous interpretation of the law or if the commission failed to follow procedures prescribed by statute or commission rule. *In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 12. An order is unreasonable when the commission's exercise of its discretion in making determinations within broad statutory criteria falls outside the zone of permissible statutory construction. *Id.* at ¶ 15. We have "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 1997-Ohio-196, ¶ 16.

{¶ 15} Additionally, a commission order is unreasonable when the decision is manifestly contrary to the evidence in the record or when the evidence is clearly insufficient to support the decision. *Firelands Wind* at ¶ 16. Likewise, an order is unreasonable when it is internally inconsistent. *Id.*

{¶ 16} In adjudicating whether a commission order is unreasonable, we do not reweigh the evidence or second-guess the commission on questions of fact. *Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35. We will not disturb the commission's factual determinations when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6896, ¶ 29.

### III. ANALYSIS

{¶ 17} OMAEG has raised four propositions of law on appeal. In its first proposition of law, OMAEG argues that the commission erred in excluding certain evidence, i.e., expert testimony OMAEG introduced and a 2023 PJM Independent Market Monitor State of the Market Report ("PJM Report").[4] In its second proposition of law, OMAEG challenges the commission's determination that the companies satisfied their burden to prove that all costs passed through the LGR Rider and all actions by the companies during the audit period were reasonable and prudent. OMAEG's third proposition of law argues that the commission's decision was against the manifest weight of the evidence. And under its fourth proposition of law, OMAEG challenges the commission's determination regarding OVEC's "must-run commitment strategy."

{¶ 18} OEC has raised three propositions of law. OEC's first proposition of law alleges that the commission misapplied the prudence and reasonableness standards in R.C. 4928.148(A)(1). In its second proposition of law, OEC claims that the commission erred in shifting the burden of proof from the companies to the

---

4. PJM is one of six regional-transmission organizations that are designated by the Federal Energy Regulatory Commission to coordinate the movement of wholesale electricity within their assigned region. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2006-Ohio-5853, ¶ 5-6. PJM is currently the sole manager of the wholesale electricity market in Ohio. *See Cleveland Elec. Illum. Co. v. Cleveland*, 2021-Ohio-4463, ¶ 5.

parties that had intervened in the proceedings below. And OEC argues under its third proposition of law that the commission violated R.C. 4903.09 with respect to the OVEC commitment strategy.

{¶ 19} For the following reasons, we conclude that OMAEG and OEC have failed to demonstrate reversible error. The arguments are addressed out of order for ease of discussion.

## A. OMAEG's proposition of law No. 1: Whether the commission's exclusion of certain evidence was unlawful and unreasonable

{¶ 20} OMAEG first argues that the commission erred by excluding relevant and material evidence, i.e., expert testimony it introduced and the PJM Report, contrary to R.C. 4928.148, R.C. 4928.01(A)(42), the Rules of Evidence, and the commission's own precedent. Specifically, OMAEG claims that the commission unreasonably and unlawfully failed to reverse the ALJ's rulings (1) striking large portions of testimony provided by John Seryak, OMAEG's expert witness, and (2) excluding an excerpt from the PJM Report. According to OMAEG, this excluded evidence was directly relevant to the prudence and reasonableness of OVEC costs and sales flowing through the LGR Riders for the audit period, as well as whether the companies' actions and inactions during that time were reasonable and prudent. OMAEG further claims that the commission violated R.C. 4903.09 by failing to appropriately address OMAEG's arguments and cite record evidence supporting its decision to exclude the testimony and report.

{¶ 21} Before we address OMAEG's arguments, the following background is provided for context.

### 1. Background on the commission's exclusion of evidence

{¶ 22} OMAEG argued before the commission that Seryak should have been allowed to testify about the commission's previous decisions auditing the costs recovered under prior OVEC recovery mechanisms because his review of those decisions informed his expert opinion on the issues in this case. OMAEG

also claimed that Seryak should have been permitted to testify about the legislation enacted by the General Assembly that created the LGR Riders that replaced the companies' prior cost-recovery mechanisms. According to OMAEG, Seryak's testimony about the prior OVEC riders, the prior commission audits of those OVEC riders, and the legislation creating the LGR Riders was relevant because the LGR Riders recover the same costs as those recovered under prior OVEC riders and the underlying analysis to be conducted by the commission in this case was the same.

{¶ 23} As for the PJM Report, OMAEG offered it to show that some costs passed through the LGR Riders should not have been allowed, because they were associated with the potential premature retirement of one of the OVEC plants—Clifty Creek—as it related to the companies' advance debt repayment. In defining "prudently incurred costs related to a legacy generation resource," R.C. 4928.01(A)(42) excludes the recovery of any remaining debt in the event of the premature retirement of a legacy-generation resource. According to OMAEG, the PJM Report contained information about the likelihood that the Clifty Creek plant would be prematurely retired before the next audit of the LGR Riders, which OMAEG argued would be relevant to whether the companies' actions and recovery of OVEC charges during the 2020 audit period were prudent as well as to certain questions surrounding the companies' debt costs.

{¶ 24} As noted above, during the evidentiary hearing the ALJ struck portions of Seryak's testimony and excluded an excerpt from the PJM Report. OMAEG challenged the ALJ's evidentiary rulings in its posthearing brief.

{¶ 25} The commission rejected OMAEG's challenge, finding that this proposed evidence was outside the scope of and irrelevant to the instant audit proceedings as well as prejudicial to the companies. The commission noted that the ALJ had previously determined that the scope of the proceeding was limited to reviewing the prudence and reasonableness of the actions of the companies with ownership interests in OVEC during calendar year 2020, rather than events leading

up to the creation and implementation of the LGR mechanism. The commission conceded that the LGR Rider audits and prior audits of the former OVEC cost-recovery mechanisms had obvious similarities, but it found that the audits were completely separate and that this case concerned a different set of OVEC-related riders that were created under a completely different statutory scheme in R.C. 4928.148. The commission thus determined, consistently with the ALJ's prior statements, that this proceeding and the audit reports were conducted in accordance with R.C. 4928.148, which requires the commission to examine only the prudence and reasonableness of all costs recovered under the LGR Riders created under R.C. 4928.148. The commission further found that under its precedent, "an auditor's actions in a prior proceeding lack relevance even where there are 'obvious similarities between the audits,' such as being 'conducted by the same auditor, on similar timelines, and concerning similar OVEC riders.'" 2024 WL 4039780 at ¶ 41, quoting *In re Review of the Reconciliation Rider of Duke Energy Ohio, Inc.*, PUCO No. 20-167-EL-RDR, 2023 Ohio PUC LEXIS 877, ¶ 34 (Sept. 6, 2023).

{¶ 26} In finding that the ALJ properly excluded portions of Seryak's testimony and the PJM Report, the commission also determined that this evidence provided background information on topics related to prior audits of mechanisms that were replaced by the LGR Riders—i.e., information beyond that included in the audit reports. The commission reiterated that this case did not concern any prior recovery mechanism that was replaced by the LGR Riders under R.C. 4928.148, that this was the commission's first review of an audit conducted under that statute, and that commission decisions involving the companies' recovery mechanisms for OVEC costs that have been replaced by the LGR Riders were not germane to its review. Finally, the commission found that it would have been inappropriate to consider testimony from Seryak, a nonattorney, on the purely legal issue regarding "costs" as defined in R.C. 4928.01(A)(2).

{¶ 27} The commission upheld the ALJ's exclusion of the Seryak testimony and the PJM Report on rehearing.

### 2. Whether the commission erred in excluding portions of Seryak's testimony

{¶ 28} OMAEG first argues that the commission erred in excluding the Seryak testimony because the excluded testimony was relevant evidence under Evid.R. 401. Under this rule, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The commission has "'very broad discretion' to conduct its hearings." *In re Complaint of Harris Design Servs. v. Columbia Gas of Ohio, Inc.*, 2018-Ohio-2395, ¶ 24, quoting *Greater Cleveland Welfare Rights Org., Inc. v. Pub. Util. Comm.*, 2 Ohio St.3d 62, 68 (1982). So, to prevail on its Evid.R. 401 claim, OMAEG must show an abuse of discretion.

{¶ 29} The pertinent section of OMAEG's brief contains a single citation to one page of Seryak's direct testimony, which OMAEG maintains concerns the creation of the LGR Riders under R.C. 4928.148. OMAEG argued in its merit brief that Seryak's excluded testimony is directly relevant to whether the costs were authorized to be recovered under the statute and to whether the companies' actions were reasonable and prudent during the audit period because the "investigations into [the] underlying legislation [2019 Am.Sub.H.B. No. 6 ("H.B. 6")] revealed that AEP [Ohio] received" nearly $68 million in 2020 from the LGR Rider. OMAEG claims that the fact that AEP Ohio is a primary beneficiary of the LGR Rider means that "it has less incentive to act in a prudent and reasonable manner" and "further calls into question whether all of the 2020 OVEC costs passed on to customers were reasonable and prudently incurred, and whether at least . . . [AEP Ohio] acted prudently and reasonably during the Audit Period."

{¶ 30} OMAEG has failed to show that the commission abused its discretion when it determined that the testimony it excluded was irrelevant. To

begin with, contrary to OMAEG's claim, Seryak did not testify that *investigations into the H.B. 6 legislation revealed* that AEP Ohio received nearly $68 million from its LGR Rider in 2020. Rather, Seryak cited the auditor's report of AEP Ohio's LGR Rider—not the investigations into H.B. 6 legislation—as the source for AEP Ohio's $68 million recovery. This undermines OMAEG's assertion that Seryak's testimony regarding the legislation that created the LGR Riders is directly relevant to the underlying proceedings. Moreover, OMAEG has not explained how the amount that AEP Ohio recovered through the LGR Rider during the audit period created a disincentive for the company to act in a prudent and reasonable manner. Under R.C. 4928.148(A)(1), the commission is required to exclude any costs that it determines are imprudent and unreasonable. It would seem that AEP Ohio has every incentive to show that it acted in a reasonable and prudent manner in order to recover its OVEC costs.

{¶ 31} In addition to failing to provide the necessary record support, OMAEG has presented no argument that would call the commission's exclusion of the Seryak testimony into question. As explained above, the commission upheld the ALJ's exclusion of portions of Seryak's testimony on the grounds that it was outside the scope of and irrelevant to the audit proceedings and was prejudicial to the companies. But other than the one instance mentioned above, OMAEG never addresses the substance of Seryak's excluded testimony or offers an explanation for how the specific matters that Seryak testified to are within the scope of the audit proceedings and not prejudicial to the companies. In short, OMAEG has offered nothing more than blanket assertions that Seryak's excluded testimony was relevant and should have been admitted. OMAEG has thus failed to carry its burden. *See In re Application of Duke Energy Ohio, Inc.*, 2012-Ohio-1509, ¶ 16-18 (single citation to the record constituted failure to support essential factual assertions with citations to the record and was fatal to utility company's argument regarding commission's disallowance of costs).

### 3. *Whether the commission violated OMAEG's due-process rights by excluding the Seryak testimony*

{¶ 32} OMAEG also contends that the commission's exclusion of the Seryak testimony violated OMAEG's due-process rights. We lack jurisdiction over this claim because OMAEG did not raise a due-process argument in an application for rehearing before the commission as required by R.C. 4903.10, which bars an appellant from raising a claim on appeal that was not specifically set forth in an application for rehearing of the commission's order. *See In re Application of Ohio Power Co.*, 2014-Ohio-4271, ¶ 45.

### 4. *Whether the commission's exclusion of the PJM Report was unreasonable, unlawful, or against the manifest weight of the evidence*

{¶ 33} OMAEG contends on appeal that the commission's exclusion of the proffered excerpt from the PJM Report was unlawful, unreasonable, and against the manifest weight of the evidence. OMAEG argues in its merit brief that the PJM Report contained "evidence of the premature retirement or the likelihood of a premature retirement of the Clifty Creek OVEC plant." OMAEG thus claims that the PJM Report was directly relevant to whether the companies' actions and recovery of OVEC charges during the 2020 audit period were prudent.

{¶ 34} Once again, OMAEG has failed to carry its burden. According to OMAEG's merit brief, the PJM Report was relevant to show that the advance debt payment that the companies collected during the 2020 audit period was used to pay down debt after declaring an early retirement in violation of R.C. 4928.148 and 4928.01(A)(42), which prohibit the recovery of any remaining debt in the event of the premature retirement of a legacy-generation resource. The PJM Report was proffered into evidence during the evidentiary hearing. Although OMAEG claims in its merit brief that the PJM Report contained "evidence of the premature retirement or the likelihood of a premature retirement of the Clifty Creek OVEC plant," OMAEG fails to cite any part of the excluded PJM Report that would

support this claim. Moreover, although the PJM Report was proffered during the hearing, the report apparently was never made part of the record. Without the PJM Report, we are unable to determine whether it was relevant to the issues before the commission. In short, OMAEG has failed to create a record sufficient for this court to decide whether the commission erred in excluding the proffered excerpt from the PJM Report. *See Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 2009-Ohio-6764, ¶ 38-40 (it would be speculation for us to consider a service-line-warranty company's contractual obligations when the contract or terms of the contract were not included in the record).

### 5. *Whether the commission violated R.C. 4903.09 in excluding the Seryak testimony and the PJM Report*

{¶ 35} OMAEG next claims that the commission violated R.C. 4903.09 because the order and entry on rehearing both failed to appropriately address OMAEG's arguments and cite record evidence supporting the ALJ's exclusion of the Seryak testimony and the PJM Report.

{¶ 36} "'[T]he commission abuses its discretion if it renders an opinion on an issue without record support'" and a supporting rationale. *Tongren v. Pub. Util. Comm.*, 1999-Ohio-206, ¶ 8, quoting *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 1996-Ohio-296, ¶ 12. While strict compliance with the terms of R.C. 4903.09 is not required, the order must contain sufficient detail for this court to determine the factual basis and reasoning that the commission relied on in reaching its decision. *Id.* at ¶ 7; *Payphone Assn. v. Pub. Util. Comm.*, 2006-Ohio-2988, ¶ 32.

#### a. The commission's order satisfied R.C. 4903.09

{¶ 37} We find that the commission's order satisfied R.C. 4903.09. To begin with, the commission's order specifically addressed OMAEG's challenges to the ALJ's decisions striking portions of Seryak's testimony and excluding the proffered excerpt from the PJM Report. Moreover, contrary to OMAEG's

assertions, the commission's order set forth sufficient reasons for upholding the ALJ's determinations and, in doing so, provided record support. Specifically, the commission agreed with the ALJ's finding that under R.C. 4928.148, the scope of the proceeding was limited to reviewing the prudence and reasonableness of the companies' actions with ownership interests in OVEC during calendar year 2020, rather than the events leading up to the creation and implementation of the LGR mechanism. The commission proceeded to explain that the excluded portions of Seryak's testimony and the PJM Report went well beyond the information included in the audit reports, which included only background information on earlier audits and prior mechanisms that were replaced by the LGR Riders. The commission also determined that excluding this evidence on relevance grounds was consistent with commission precedent. In addition, the commission reiterated that the former OVEC recovery mechanisms were replaced by the LGR Riders under R.C. 4928.148 and that decisions related to any former recovery mechanisms were not germane to the commission's review in this proceeding. Finally, the commission explained that Seryak, a nonattorney, was precluded from testifying on purely legal issues.

{¶ 38} The purpose of R.C. 4903.09 is to ensure that this court is provided with an adequate record to determine how the commission reached its decision. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 311 (1987); *Allnet Communications Servs. v. Pub. Util. Comm.*, 1994-Ohio-460, ¶ 27. As noted above, the commission's order in this case contained detailed reasoning and ample record citations for us to determine the basis for its determination. Hence, no violation of R.C. 4903.09 occurred. *See In re Application of E. Ohio Gas Co.*, 2023-Ohio-3289, ¶ 25-27.

*b. OMAEG did not preserve an R.C. 4903.09 challenge to the commission's rehearing entry*

{¶ 39} OMAEG also claims that the commission's October 15, 2024 rehearing entry failed to satisfy R.C. 4903.09. OMAEG, however, never filed a *second* application for rehearing and thus never alleged a violation of R.C. 4903.09 with regard to the commission's rehearing entry. OMAEG's failure to apply for rehearing on this ground deprives us of jurisdiction over the claim on appeal. *See Discount Cellular, Inc. v. Pub. Util. Comm.*, 2007-Ohio-53, ¶ 66.

*6. Whether the commission's decisions to exclude the Seryak testimony and the PJM Report were against the manifest weight of the evidence*

{¶ 40} As a final matter, OMAEG purports to raise a manifest-weight challenge to the commission's exclusion of the Seryak testimony and the proffered excerpt from the PJM Report. The heading setting forth OMAEG's first proposition of law and the first and third subheadings under it allege that the commission's exclusion of this evidence was "contrary to the manifest weight of the evidence." The pertinent sections of OMAEG's brief, however, contain no manifest-weight argument. OMAEG has therefore failed to show that the commission's decisions to exclude Seryak's testimony and the PJM report were against the manifest weight of the evidence.

**B. OMAEG's proposition of law No. 4: Whether the commission failed to properly determine the prudence of OVEC's commitment strategy and whether the commission's determination regarding the companies' must-run-commitment strategy violated R.C. 4903.09**

{¶ 41} Under its fourth proposition of law, OMAEG argues that the commission "erred by finding that the OVEC must-run commitment strategy was not a management decision by any of the individual Sponsoring Companies." OMAEG states that R.C. 4928.148(A)(1) explicitly requires the commission to determine whether the companies' commitment strategy was prudent and

reasonable, and it asserts that the statute does not allow the commission to "side step this analysis," even if the commitment strategy was not a decision made by the companies. OMAEG further claims that the commission violated R.C. 4903.09 by failing to explain its decision and identify record evidence on which the decision was based.

{¶ 42} As explained below, OMAEG has not demonstrated reversible error. The following background is offered for context.

### 1. Background on OVEC's commitment strategy

{¶ 43} PJM operates two energy markets: the day-ahead market and the real-time market. The day-ahead market determines PJM's level of demand on a daily basis for each hour of the following day and uses an economic-dispatch model to satisfy the hourly demand at the lowest possible cost while accounting for the availability of transmission. The real-time market operates to satisfy surpluses and deficits in both demand and energy settled in the day-ahead market.

{¶ 44} To participate in the PJM markets, all generators—including the companies—are required to provide PJM with certain data, including the commitment designation for each generation plant. The commitment designation refers to the plant operator's decision to run or not run a generation plant. Under a must-run-commitment strategy, the generation plant operates continuously without regard to whether the wholesale-energy-market price is high enough to cover the plant's fuel and variable costs to produce the energy. In contrast, a unit operated under an economic-commitment strategy will operate only when it is economical to do so, meaning that the price of energy on the wholesale market is greater than the marginal costs to produce that power when PJM calls for the plant to operate.

{¶ 45} OVEC is governed by a board of directors and an operating committee. The companies each have one member serving on OVEC's operating committee, which also includes one member from each of the other sponsoring companies and one member from OVEC. The operating committee's role is to

establish the necessary framework for OVEC's management to conduct its daily operations on behalf of the sponsoring companies, including procedures for scheduling, operating, testing, and maintenance of OVEC generation resources. Any adoption or modification of an OVEC procedure requires approval by at least two-thirds of its operating-committee members participating at any meeting.

{¶ 46} Since OVEC joined PJM in 2018, in accordance with the procedures approved by the operating committee, OVEC has utilized a must-run-commitment strategy for its generation resources (except for the Clifty Creek Unit 6 plant). Changing OVEC's must-run-commitment status requires the unanimous approval of the operating committee (excluding the OVEC representative). During the 2020 audit period, all OVEC generating plants except for Clifty Creek Unit 6 were designated as must-run except from April 14 to June 30, 2020, when the OVEC operating committee unanimously agreed to temporarily operate the plants on an economic-commitment basis.

{¶ 47} The commission found that because "the OVEC commitment strategy was not a management decision by any of the individual [sponsoring companies]," the companies "cannot be found to have acted imprudently." 2024 WL 4039780 at ¶ 82. According to the commission, the companies had no control over the ultimate commitment strategy, because (1) the companies each had only one vote on the operating committee, (2) the must-run-commitment strategy was based on established OVEC policy that required a two-thirds majority of the operating committee to adopt under the InterCompany Power Agreement, and (3) unanimous approval of the operating committee is required to change the must-run-commitment status. *Id.*

{¶ 48} The commission went on to find, however, that even if the companies were responsible for the OVEC commitment strategy, OVEC's combined must-run and economic-commitment strategy utilized during the 2020 calendar year was prudent. *Id.* at ¶ 83. Accordingly, the commission declined to

disallow any costs associated with the OVEC commitment strategies employed during the audit period. *Id.* at ¶ 86.

### 2. Whether the commission failed to review the companies' decisions related to OVEC's commitment strategy as required by R.C. 4928.148(A)(1)

{¶ 49} OMAEG claims that the commission failed to apply the plain language of R.C. 4928.148(A)(1) by failing to examine whether the companies' commitment strategy was prudent and reasonable. In its merit brief, OMAEG contends that the commission "should have heeded its statutory mandate . . . by holding the [companies] accountable for the imprudent OVEC commitment decisions, including [the companies'] decisions to run OVEC on a must-run basis instead of economic."

{¶ 50} To the extent that the commission determined that it could *not* hold the companies accountable for any imprudent decisions regarding the OVEC commitment strategy, we find that this was error. R.C. 4928.148(A)(1) expressly requires the commission to

> determine . . . the prudence and reasonableness of the actions of electric distribution utilities with ownership interests in the legacy generation resource, including their decisions related to offering the contractual commitment into the wholesale markets, and exclude from recovery those costs that the commission determines were imprudent and unreasonable.

As OMAEG argues, this directive is unambiguous—nothing in the statutory language exempts the companies from this review even if, as here, the companies lack ultimate control over the commitment strategy.

{¶ 51} Even so, we find that OMAEG has failed to demonstrate that the commission committed reversible error. The critical problem is that OMAEG

ignores that the commission ultimately determined that OVEC's decision to employ both a must-run and an economic-commitment strategy during the audit period was prudent. In support of its decision, the commission relied on the auditor's findings that OVEC's operational processes and procedures undertaken during the audit period on behalf of the companies were prudent. Specifically, the auditor found that OVEC's comprehensive operational procedures for the daily energy market "reflect a diligent approach to operational decision-making and market scheduling." 2024 WL 4039780 at ¶ 83. The auditor also found that because of "unforeseeable market conditions" stemming from the COVID-19 pandemic in 2020, OVEC prudently shifted from a must-run to an economic-commitment status for part of the audit period and scheduled additional maintenance outages during that time to avoid as many losses as possible. *Id.*

{¶ 52} The commission also found that the evidence demonstrated that it was prudent for OVEC to employ the must-run-commitment strategy during the 2020 audit period. *Id.* at ¶ 84, 86. The commission cited testimony from witnesses for each of the three companies supporting the must-run-commitment strategy. These witnesses testified that the main reason that many coal plants consistently operate under a must-run-commitment strategy is that there are significant costs associated with starting up and shutting down coal-fired-generation plants. These witnesses also testified that operating the OVEC plants on a must-run basis aligns with their design as baseload-generation plants,[5] which are not meant to be cycled on and off on a frequent basis. According to each witness, operating these plants

---

5. A plant that supplies baseload generation is "normally operated to take all or part of the minimum load of a system, and which consequently produces electricity at an essentially constant rate and runs continuously." United States Energy Information Administration, *Glossary*, https://www.eia.gov/tools/glossary/?id=B (accessed Feb. 23, 2026) [https://perma.cc/3YYN-EZR3]; *see also Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/baseload (accessed Feb. 23, 2026) [https://perma.cc/3TNH-WE48] (defining "baseload" as "the amount of power made available by an energy producer (such as a power plant) to meet fundamental demands by consumers").

on an economic-commitment status would require the plants to be frequently shut down and restarted, which would result in significant additional maintenance, capital, and other costs associated with stress on the equipment.

{¶ 53} In addition to the companies' evidence, the commission noted that the auditor also supported OVEC's use of the must-run-commitment status during a majority of the audit period, citing specifically the auditor's finding "that the plants performed reliably in 2020, with forced outage rates generally better than PJM averages." *Id.* at ¶ 84.

{¶ 54} As a final matter, the commission found that OVEC's decision to revert to the must-run-commitment strategy after June 30, 2020, was prudent. (Recall that OVEC temporarily operated the plants on an economic basis from April 14 to June 30, 2020.) On this issue, the commission agreed with AEP Ohio witness Jason Stegall's assessment that "'obligations under OVEC's coal contracts and the potential consequences for violations of these contracts'" rendered it necessary to return to the must-run-commitment strategy. *Id.* at ¶ 84.

{¶ 55} In sum, contrary to OMAEG's claim, the commission did not sidestep the analysis required under R.C. 4928.148(A)(1). Rather, the commission reviewed the combined commitment strategies that OVEC employed during the audit period on behalf of the companies, found that OVEC's decisions were prudent when they were made, and determined that no costs related to the commitment strategies should be disallowed. Accordingly, we find that the commission's review complied with R.C. 4928.148(A)(1).

### 3. Whether the commission's decision regarding OVEC's commitment strategy violated R.C. 4903.09

{¶ 56} OMAEG also claims in its merit brief that "[d]ue to the [commission's] decision that the OVEC commitment strategy was not a management decision by any of the individual Sponsoring Companies, the [commission's] Orders fail to explain the [commission's] decision and identify, in

sufficient detail to enable review, the record evidence upon which its decision was based, in violation of R.C. 4903.09."

{¶ 57} As discussed in detail above, the commission explained the basis of its decision on the combined OVEC commitment strategies and supported it with citations to the record. Likewise, the commission also offered an explanation and record support for its finding that the OVEC commitment strategy was not a management decision made by any one sponsoring company. In short, the commission's order contained sufficient detail for us to determine the factual basis and reasoning that the commission relied on in reaching its decision. *See Tongren*, 85 Ohio St.3d at 89-90; *Payphone Assn.*, 2006-Ohio-2988, at ¶ 32. That is all R.C. 4903.09 requires.

### C. OMAEG's proposition of law No. 2: Whether the commission's finding that the companies satisfied their burden of proof was unreasonable, unlawful, and contrary to the manifest weight of the evidence

{¶ 58} OMAEG raises two separate arguments under its second proposition of law. OMAEG first contends that the commission erred in finding that the companies had met their burden of proof in the proceedings below. OMAEG also asserts that the commission erred in presuming that the companies' management decisions were prudent. For the reasons explained below, we conclude that the first argument lacks merit and that we lack jurisdiction over the second argument.

### 1. *OMAEG failed to support its burden-of-proof argument*

{¶ 59} OMAEG maintains that the companies failed to meet their burden of proof because the record evidence did not demonstrate that (1) all costs recovered under the LGR Riders were reasonable and prudently incurred and (2) the companies' actions during the audit period were reasonable and prudent. OMAEG maintains that the record instead showed that the costs passed on to customers through the LGR Riders for the audit period were unjust, imprudently incurred, unreasonable, and not in the best interest of customers. Therefore, the argument

22

runs, the commission should have excluded nearly $115 million in OVEC costs that were imprudently incurred during the audit period, as required by R.C. 4928.148(A)(1) (the commission shall "exclude from recovery those costs that the commission determines imprudent and unreasonable").

{¶ 60} OMAEG raises two specific challenges. First, OMAEG challenges the commission's determination that OVEC's fuel-procurement strategy during the audit period was reasonable and prudent based on testimony that the coal contract at issue was competitively bid when it was entered into and was for a competitive offer reflecting varying market conditions.

{¶ 61} Second, OMAEG challenges the commission's findings regarding OVEC's contractual commitment strategy of offering the plants into the PJM wholesale-energy market—specifically, OVEC's must-run-commitment designation. As explained above, the commission determined that the OVEC commitment strategy was not a management decision made by any of the companies individually and therefore, the companies could not be found to have acted imprudently. The commission went on to find that even if the companies were responsible for the OVEC commitment strategy, OVEC's combined must-run and economic-commitment strategy utilized during the 2020 calendar year was prudent at that time.

{¶ 62} OMAEG maintains in its merit brief that the audit reports relied on by the commission "were replete with gaps due to the Auditor failing to reach the requisite conclusions" or failing to "perform the underlying, thorough analysis necessary to reach those conclusions." According to OMAEG, the audit reports failed to address how OVEC's must-run-commitment strategy and its fuel-procurement process resulted in higher costs to customers. OMAEG further claims that the audit reports failed to properly analyze actions that the companies could have taken to limit OVEC costs that were collected from customers through the

LGR Riders and that the audit reports failed to affirmatively determine whether the companies' actions during 2020 were reasonable and prudent.

{¶ 63} OMAEG argues that the commission's determination was against the manifest weight of the evidence, but it does not show, through citation to record evidence, how the evidence relied on by the commission failed to support its findings. To be clear, OMAEG does not mention, let alone address, the evidence the commission cited in support of its determination on these matters. Moreover, OMAEG refers repeatedly to alleged failings in the audit reports, yet it never cites those reports. It is worth noting that the auditor submitted three separate audit reports—one for each company—and that each report is over 100 pages long.

{¶ 64} In support of this claim, OMAEG offers only a single citation to the record. According to OMAEG, "the Auditor admitted during the hearing that she did not include 'anything' in the Audit Reports about whether the [companies] 'acted prudently in making energy market offers,' or about whether the [companies] 'acted imprudently in making energy market offers.' " But contrary to OMAEG's assertions, no such testimony from the auditor appears on the cited page of the hearing transcript.

{¶ 65} OMAEG bears the burden as an appellant to show that the commission's decision was against the manifest weight of the evidence or is clearly unsupported by the record. *See AK Steel Corp. v. Pub. Util. Comm.*, 2002-Ohio-1735, ¶ 20. In the end, OMAEG has pointed to nothing in the record indicating that the commission erred in finding that the companies had met their burden of proof in the proceedings below. *See In re Application of Ohio Power Co.*, 2020-Ohio-143, ¶ 29; *In re Complaint of Suburban Natural Gas Co.*, 2020-Ohio-5221, ¶ 24. For these reasons, we reject this argument.

### 2. OMAEG did not preserve its presumption-of-prudence claim

{¶ 66} OMAEG also asserts that even though the commission stated that the companies ultimately bore the burden of proof in this proceeding, the

commission unlawfully applied a presumption of prudence to the companies' management actions. OMAEG maintains that such a presumption goes against the plain language of R.C. 4928.148(A)(1), which requires the commission to determine the prudence and reasonableness of the costs passed through the LGR Riders to customers.

{¶ 67} OMAEG did not raise a presumption-of-prudence claim in its rehearing application, let alone one that alleged a violation of R.C. 4928.148(A)(1). OMAEG's failure to specify this error on rehearing before the commission deprives us of jurisdiction over the argument on appeal. *See* R.C. 4903.10; *Ohio Power Co.*, 2014-Ohio-4271, at ¶ 45.

### D. OMAEG's proposition of law No. 3: Whether the commission's decision allowing the companies to collect incurred costs from customers was unreasonable, unlawful, and contrary to the manifest weight of the evidence

{¶ 68} In its third proposition of law, OMAEG contends that the commission erred in allowing the companies to recover all OVEC costs that were charged through the LGR Riders during the audit period. OMAEG claims that this allowance was (1) contrary to the applicable statutes and (2) against the manifest weight of the evidence.

### 1. OMAEG has not shown that the commission's determination lacked record support

{¶ 69} OMAEG first argues that the commission violated R.C. 4928.148 when it refused to disallow and refund over $114.8 million in OVEC costs that were passed on to customers. OMAEG states that under R.C. 4928.148, the commission is required to exclude from recovery any costs that the commission determines are imprudent and unreasonable, and it targets four categories of costs—namely, costs related to the companies' (1) must-run-commitment strategy, (2) imprudent coal purchases, (3) "a dividend payment described in the Amended and Restated Inter-Company Power Agreement," i.e., "Component D," and (4) advance debt

repayment. OMAEG maintains that because the companies failed to sustain their burden to prove that these costs were prudently and reasonably incurred, the commission should have disallowed the recovery of all OVEC costs incurred during the audit period. According to OMAEG, the commission relied on the flawed audit reports as primary evidence supporting cost recovery and thus failed to conduct the proper review required by statute. OMAEG further asserts that the commission's determination was contrary to the manifest weight of the evidence and that the commission failed to explain its decision and cite record evidence supporting it, as required by R.C. 4903.09.

{¶ 70} OMAEG has effectively reiterated the same arguments asserted under its second proposition of law. As was the case under its second proposition of law, OMAEG offers no citations to the record supporting these claims. Therefore, OMAEG's claims lack merit and we reject them.

### 2. We lack jurisdiction over OMAEG's claims that the commission violated R.C. 4928.01(A)(42)

{¶ 71} Second, OMAEG asserts that the commission's refusal to disallow and refund to customers the costs related to the companies' Component D (a provision of the InterCompany Power Agreement) and the advance debt repayment was contrary to law. OMAEG argues that allowing the company to recover these costs violated R.C. 4928.01(A)(42), which precludes recovery of (1) "any return on investment in common equity" and (2) any remaining debt in the event of a premature retirement of a legacy-generation resource. OMAEG claims that the InterCompany Power Agreement describes Component D as a payment per common share, similar to a dividend. OMAEG also asserts that the auditor similarly testified that Component D provides "a return to the owners of OVEC."

{¶ 72} We lack jurisdiction over this issue because OMAEG did not raise these arguments in an application for rehearing before the commission as required by R.C. 4903.10. *See also Ohio Power Co.*, 2014-Ohio-4271, at ¶ 45.

26

**E.  OEC proposition of law No. 3: Whether the commission's decision related to OVEC's commitment strategy violated R.C. 4903.09**

{¶ 73} OEC claims that the commission violated R.C. 4903.09 by failing to support its decision on the OVEC commitment strategy with record evidence.  OEC maintains that contrary to R.C. 4903.09's requirements, the commission relied primarily on conclusory and incomplete testimony about the high costs to the companies for operating their plants under a flexible commitment strategy (the ability to switch back and forth between a must-run and an economic-commitment strategy).  OEC also faults the commission for ignoring testimony regarding the actual costs to the companies to restart a generation unit, which OEC alleges is much less than the above-market costs OVEC incurred during the audit year under the combined must-run and economic-commitment strategy.  We reject this argument for the following reasons.

{¶ 74} First, OEC has failed to identify where in the commission's order this alleged error occurred.  OEC claims that the commission erred in relying on the companies' "conclusory and incomplete . . . assertions" regarding the prudence of the OVEC commitment strategy.  *See* 2024 WL 4039780 at ¶ 58-59.  However, OEC has inexplicably referred us to the section of the order in which the commission has outlined the companies' arguments on this issue, rather than to the part of the order containing the commission's determination on the prudence of the commitment strategy.  OEC cannot expect to prevail on appeal if it does not properly identify where in the commission's order the alleged error occurred.  *See In re Application of Columbus S. Power Co.*, 2011-Ohio-1788, ¶ 70-71; *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, 2016-Ohio-1607, ¶ 28.

{¶ 75} Second, OEC misunderstands the test for determining the commission's compliance with R.C. 4903.09.  The question under R.C. 4903.09 is not, as OEC contends, whether the record contained sufficient evidence to support a particular finding or whether the commission failed to give weight to certain

testimony.  *See In re Application of Ohio Power Co.*, 2024-Ohio-2890, ¶ 32, citing *E. Ohio Gas Co.*, 2023-Ohio-3289, at ¶ 28, and *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 4 Ohio St.3d 107, 110, fn. 5 (1983).  Rather, R.C. 4903.09 requires only that the commission provide this court with an adequate record so that we may determine how the commission reached its decision.  *Id.*, citing *MCI Telecommunications Corp.*, 32 Ohio St.3d at 311, and *Allnet Communications Servs.*, 1994-Ohio-460, at ¶ 27.  As explained above, the commission's orders in this case contain ample record citations for us to determine the factual basis for the commission's findings.  In short, OEC has not shown a violation of R.C. 4903.09.

### F.  OEC proposition of law No. 2: Whether the commission unreasonably and unlawfully shifted the burden of proof from the companies and to the opposing parties

{¶ 76} OEC claims that the commission improperly shifted the burden of proof from the companies and to the opposing parties by applying a presumption of prudence to the companies' management practices.  According to OEC, the commission's application of a presumption of prudence contradicts this court's precedent resulting in reversible error with respect to the commission's findings.

{¶ 77} In the proceedings below, all parties agreed that the companies bore the burden of proof in demonstrating that the costs passed through the LGR Riders were reasonable and prudently incurred.  Nevertheless, the commission determined that under its decision in *In re Syracuse Home Util. Co.*, PUCO No. 86-12-GA-GCR, 1986 Ohio PUC LEXIS 1 (Dec. 30, 1986), a presumption of prudence applies to the companies' management decisions.  The commission emphasized, however, that the presumption that a public utility's decisions were prudent is rebuttable and that evidence produced by staff or intervenors may overcome that presumption.

{¶ 78} For the reasons explained below, we agree with OEC that the commission erred in applying a presumption of prudence to the companies' management decisions, but we conclude that the record does not support a finding

of reversible error. First, a brief discussion of *Syracuse Home* is given to provide context.

### 1. The commission's decision in Syracuse Home Util. Co.

{¶ 79} In *Syracuse Home*, the commission held that assessments of the prudence of a public utility's decisions should be made in accordance with four guidelines set by the National Regulatory Research Institute: (1) utility decisions should be presumed prudent, (2) the standard of reasonableness under the circumstances should be used, (3) hindsight should not be used to determine prudence, but outcomes may be used to overcome the presumption of prudence, and (4) prudence should be determined in a retrospective, factual inquiry. *Syracuse Home* at *21. There, the commission noted that the effect of the presumption of prudence was to shift the burden of producing evidence—or the burden of production—from the utility to the opposing party. According to the commission, while the burden of persuasion—or the burden of proof—generally rests throughout the proceeding on the same party, the burden of production can shift back and forth. *Id.* at *22. Thus, applying the presumption of prudence to the utility's management decisions would shift the initial burden of production to the opposing party to rebut the presumption, and the burden of production would shift back to the utility only if the opposing party submitted evidence showing that the utility's actions were imprudent. *Id.*

### 2. The commission's application of a presumption of prudence is contrary to our case law

{¶ 80} As noted above, OEC claims that the commission erred in applying a presumption of prudence to the companies' management decisions because it shifted the initial burden of proof to the opposing parties rather than to the companies where it belonged. We find that the commission's application of a presumption of prudence to the companies' management decision is contrary to *In re Application of Duke Energy Ohio, Inc.*, 2012-Ohio-1509. In that case, Duke

sought to recover the costs it had incurred to restore power and repair damage to electrical infrastructure caused by a major storm stemming from Hurricane Ike. *Id.* at ¶ 3-4. Duke asked for reimbursement of roughly $30.7 million, but the commission found significant problems with the evidence supporting Duke's reimbursement request and allowed it to recover only about half of what it had requested. *Id.* at ¶ 4-6.

{¶ 81} On appeal, Duke raised various arguments contending that the commission's order lacked record support. We rejected Duke's arguments, finding that Duke bore the burden to prove that the costs it sought to recover were reasonable and prudently incurred but that Duke had failed to carry that burden before the commission. *Id.* at ¶ 8-9.

{¶ 82} In accord with *Duke*, the companies in this case agreed that they bore the burden to prove that the costs they sought to recover were prudently and reasonably incurred. Although the question whether a utility is entitled to a presumption of prudence in its management decisions was not at issue in *Duke*, our decision made clear that utilities bear the initial burden of proof to produce evidence demonstrating that their costs are prudently incurred and reasonable, thereby foreclosing the application of a presumption of prudence to utility-management decisions. In particular, we found that Duke's arguments on appeal seemed to misapprehend that it bore the burden to prove that its expenses were reasonable. That is, "Duke had to prove a positive point: that its expenses had been prudently incurred. The commission did not have to find the negative: that the expenses were imprudent. Accordingly, if [Duke's] evidence was inconclusive or questionable, the commission could justifiably reduce or disallow cost recovery." *Duke* at ¶ 8. We explained that on appeal, Duke showed "at best, that other parties did not conclusively prove that the claimed expenses were unreasonable or imprudent." We concluded, "that claim is irrelevant because those parties did not bear the burden of proof." *Id.* at ¶ 9.

{¶ 83} Moreover, although we cited *Syracuse Home* with approval in *Cincinnati v. Pub. Util. Comm.*, 1993-Ohio-79, we notably did not endorse the *Syracuse Home* presumption of prudence in the *Cincinnati* case. *Cincinnati* at ¶ 13. Indeed, in that case we adopted the commission's definition of a prudent decision and, in doing so, we applied only the second, third, and fourth guidelines of the *Syracuse Home* guidelines: a prudent decision is one that reflects what a reasonable person would have done in light of conditions and circumstances that were known or reasonably should have been known at the time the decision was made (second guideline), and prudence should be determined in a retrospective, factual inquiry, without the use of hindsight judgment (third and fourth guidelines). *Cincinnati* at ¶ 13.

{¶ 84} In sum, we hold that the commission erred in applying a presumption of prudence in this case. However, as explained in the next section, we conclude that OEC has failed to demonstrate reversible error.

### 3. *The commission's application of a presumption of prudence did not result in reversible error*

{¶ 85} OEC's challenge to the commission's application of the presumption of prudence implicates only one aspect of the commission's audit review: the commission's review of the prudence and reasonableness of OVEC's fuel-procurement strategy. Specifically, OEC alleges that the commission's application of the presumption shifted the initial burden from the companies to the opposing parties to prove that OVEC's coal-procurement practice with regard to a 2012 coal contract was imprudent rather than requiring the companies to show that the contract was prudent.

{¶ 86} With regard to the 2012 coal contract (the Resource Fuels contract), the commission found "that the evidence presented by the intervening parties does not overcome the rebuttable presumption that the Compan[ies'] management decisions were prudent." 2024 WL 4039780 at ¶ 92. Had the commission ended

its discussion of the issue there, the commission would have committed reversible error by shifting the initial burden of proof from the companies to the opposing parties. But the commission also found that AEP Ohio witness Stegall's testimony on this matter was convincing. According to the commission, Stegall testified that the coal contract at issue was competitively bid in 2012, was for a competitive offer, and reflected varying market conditions—which supported its having a different price than other contracts. The commission also noted that the auditor had obtained extensive data from the companies regarding their coal purchases. Moreover, the commission cited testimony provided by the auditor, stating that after an extensive review, she had found in her audit reports that the 2012 coal contract was not imprudent.

{¶ 87} In sum, even though the commission purported to apply a presumption of prudence to the companies' management decisions regarding the 2012 coal contract, it appears that the commission did consider evidence from the companies as well as findings from the audit reports that supported the companies' claim that their fuel-procurement strategy during the audit period was prudent and reasonable. That is, the commission cited evidence showing that the companies had carried their initial burden of proof. Thus, to the extent that the commission applied a presumption of prudence to the companies' management decisions, the presumption does not appear to have been applied in a manner consistent with *Syracuse Home*, because the commission did not end its inquiry after finding that the opposing parties had not rebutted the presumption. Thus, we find that any error in this regard was harmless and does not constitute reversible error.

## G. OEC's proposition of law No. 1: Whether the commission misapplied the reasonable-and-prudent standard under R.C. 4928.148(A)(1)

{¶ 88} Under R.C. 4928.148(A)(1), "[t]he commission shall determine . . . the prudence and reasonableness of the actions of electric distribution utilities with ownership interests in the legacy generation resource . . . and exclude from recovery

those costs that the commission determines imprudent and unreasonable." OEC argues that while there is some overlap between "prudence" and "reasonableness" in R.C. 4928.148(A)(1), the words have separate meanings and thus reflect two distinct standards of review. According to OEC, the commission largely conflated the two terms when it conducted its review and failed to evaluate the companies' actions under the reasonableness standard.

{¶ 89} OEC's alleged error hinges entirely on its preferred definition of "reasonableness." According to OEC, to satisfy the separate "reasonableness" standard under R.C. 4928.148(A)(1), the companies must show that their actions benefitted ratepayers and were in the public interest. OEC maintains that the commission committed reversible error by failing to review the companies' actions under this standard. As explained below, R.C. 4928.148(A)(1) does not require the commission to evaluate whether the companies' actions benefitted ratepayers and the public interest under this suggested "reasonableness" standard.

{¶ 90} OEC finds support for its understanding of "reasonableness" for purposes of R.C. 4928.148(A)(1) in the commission's three-part test for evaluating the reasonableness of a contested stipulation. To be approved under that test, the commission determines whether the stipulation (1) is a product of serious bargaining among capable, knowledgeable parties, (2) as a package, benefits ratepayers and the public interest, and (3) violates any important regulatory principle or practice. *Consumers' Counsel v. Pub. Util. Comm.*, 1992-Ohio-122, ¶ 15; *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 39. Based on the second prong of this test, OEC maintains that this court and the commission have defined "reasonableness" as including an inquiry into whether the actions of a public utility have benefited ratepayers and served the public interest.

{¶ 91} Although it is not entirely clear, OEC appears to be arguing that "reasonableness" under R.C. 4928.148(A)(1) has acquired a technical or particular meaning, based on the commission's three-part reasonableness test. *See* R.C. 1.42

("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). But the commission adopted the three-part test for the purpose of evaluating contested stipulations in cases before the commission, and to our knowledge the test has never been applied outside that context. Indeed, the test is not grounded in any statutory provision, and OEC has cited no case law in which the test has been applied to interpret any statutory provision. Moreover, while this court has approved the commission's use of the three-part test in evaluating contested stipulations filed before the commission, we review the commission's approval of contested stipulations under a different standard—namely, R.C. 4903.13. *See Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.*, 1994-Ohio-435, ¶ 12.

{¶ 92} In addition, R.C. 4928.148(A)(1) does not expressly include a ratepayer-benefit or public-interest requirement. When interpreting a statute, we must first examine the plain language of the statute to determine legislative intent. *In re Application of Columbus S. Power Co.*, 2014-Ohio-462, ¶ 26. In matters of statutory interpretation, courts must give effect to the words used in the statute, and they cannot add nor delete from the words chosen by the General Assembly. *Id.* Had the General Assembly intended to require the commission to consider whether the companies' actions benefitted ratepayers and were in the public interest, "it would have chosen words to that effect," *id.*

{¶ 93} As a final matter, OEC asks this court to "consider" the definition of "reasonable" in *Black's Law Dictionary* in support of its ratepayer-benefit and public-interest claim. According to OEC, *Black's* (12th Ed. 2024) defines "reasonable" in this context as "'[r]eflecting good judgment; fair and proper under the circumstances; rational, sound, and sensible.'" Yet OEC never explains how this definition suggests that the commission was required to determine whether the companies' actions benefited ratepayers or served the public interest in this case.

{¶ 94} In sum, the commission did not err in refusing to review the companies' actions under a ratepayer-benefit or public-interest test. Therefore, we reject OEC's first proposition of law.

## IV. CONCLUSION

{¶ 95} For the foregoing reasons, we find that OMAEG and OEC have not demonstrated reversible error in the commission's decision in this case. Therefore, we affirm the commission's orders.

Orders affirmed.

_____

Chris Tavenor and Karin Nordstrom, for appellant Ohio Environmental Council.

Carpenter Lipps, L.L.P., Kimberly W. Bojko, and Emma Y. Easley, for appellant Ohio Manufacturers' Association Energy Group.

Dave Yost, Attorney General, John H. Jones, Public Utilities Section Chief, and Ambrosia E. Wilson and Thomas G. Lindgren, Assistant Attorneys General, for appellee.

Rocco O. D'Ascenzo, Jeanne W. Kingery, Larisa M. Vaysman, and Elyse H. Akhbari, for intervening appellee Duke Energy Ohio, Inc.

Steven T. Nourse; and Porter, Wright, Morris & Arthur, L.L.P., Eric B. Gallon, and L. Bradfield Hughes, for intervening appellee Ohio Power Company.

Christopher C. Hollon, for intervening appellee Dayton Power and Light Company, d.b.a. AES Ohio.

Benesch Friedlander Coplan & Aronoff, N. Trevor Alexander, and Samantha R. Meng, for intervening appellees.

_____